**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Q.G., by and through his Parents, | : | |
| James G. and Marlina S. | : | |
| of Wilmington, Delaware | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. |
| | : | |
| BRANDYWINE SCHOOL DISTRICT | : | |
| 1311 Brandywine Boulevard, | : | |
| Wilmington, Delaware 19809 | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

### I.    Introduction

1.    This matter is an appeal from a Delaware special education administrative due process hearing that occurred before a Due Process Hearing Panel ("Panel"). During the hearing, a Panel member inappropriately interrupted the Plaintiff's direct examination of a witness, criticized a document the Plaintiff was admitting, and then engaged in *ex parte* communication with opposing counsel concerning the Panel member's criticisms of the witness. The Plaintiff moved for recusal of the Panel member and a new hearing. The Panel Chair then recused the Panel member but denied the request for a new hearing.

2.    Even after the Panel member's recusal, she continued to argue to the Panel via email that she should not have been recused and why her interruption of the Plaintiff's examination of the witness and subsequent *ex parte* communication was warranted.

3.    The Panel then ruled against the Plaintiff and in favor of the Defendant Brandywine School District ("School District") in all respects, holding that the School District offered Plaintiff Q.G. an IEP that provided him with a Free Appropriate Public Education ("FAPE") under the

1

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

4.     The Panel's decision is thinly supported and deeply flawed on the merits.

5.     In addition, the underlying proceeding is unreliable, and the Plaintiff urges this Court to disregard it in its entirely, admit supplemental evidence demonstrating the fundamental flaws of the Delaware Special Education Due Process hearing system which violate state and federal law, and render judgment in favor of the Plaintiffs based on the administrative record and Plaintiff's supplemental evidence.

6.     This action is brought by Q.G., a nine year old child with disabilities, and his parents James G. and Marlina S. ("Plaintiffs" or the "Family"), against the School District IDEA, Section 504, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; the federal and state implementing-regulations of the foregoing statutes; and 14 Del. Admin. C. § 922 *et seq.*

7.     Q.G. is a young man with Specific Learning Disabilities in Basic Reading and Written Expression whose parents were forced to place him at the Pilot School after the School District failed to offer him a FAPE.

8.     After fully considering the record and Plaintiff's additional evidence, this Court should determine that the Defendant violated the foregoing statutes, reverse the Hearing Panel's Decision, and award appropriate relief to the Family including tuition reimbursement for Q.G.'s 2022-2023 school year at the Pilot School, reasonable attorneys' fees and costs, and any other relief this Court deems just.

## II.  **Parties**

9.     Q.G. was born in 2014 and at all relevant times resided in Wilmington, Delaware

with his Parents and within the geographical boundaries of the Defendant School District. Q.G. is a student with disabilities as defined under IDEA with a disability classification of Autism, and a Protected Handicapped Student under Section 504 and the ADA.

10.     The District is located at 1311 Brandywine Boulevard Wilmington, Delaware 19809. It is the recipient of several sources of federal funds and is an educational agency designated by Delaware law and the Delaware Department of Education for the provision of educational services to individuals residing within its boundaries including those mandated under IDEA and Delaware's statutory/regulatory scheme concerning young children with disabilities, 14 Del. Admin. C. § 922 *et seq.*

## III.    Jurisdiction and Venue

11.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because it raises federal questions under the IDEA, Section 504, and the ADA.

12.     Plaintiffs have exhausted their administrative remedies where required under IDEA (20 U.S.C. § 1415(i)), having timely pursued a Special Education Due Process hearing. Neither Section 504 nor the ADA require the exhaustion of administrative remedies and in Delaware, the Department of Education does not permit parents to raise administrative claims under Section 504 or the ADA alongside an IDEA claim; thus, the Plaintiff's state due process complaint only concerned IDEA. Absent an ability to raise Section 504 or ADA claims at a state administrative hearing, those claims are appropriately raised for the first time to this Court.

13.     Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415 and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

14.     All of the Defendant's actions have taken place within the jurisdiction of the United

States District Court for the District of Delaware. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391.

## IV.    <u>Applicable Law</u>

### A.    **IDEA requires that a school district identify all children with disabilities who live in the district and conduct a special education evaluation.**

15.    The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

16.    After a child is determined to be eligible, IDEA and its regulations provide for periodic reevaluations, which "may occur not more than once a year unless the parent and public agency agree otherwise; and must occur at least once every three years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(i), (ii); *see also* 34 C.F.R. § 300.303(b).

17.    School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); 34 C.F.R. 300.303(a).

18.    According to IDEA, school districts must, at a minimum, evaluate students with disabilities at least every three years, commonly known as a "triennial evaluation." 34 C.F.R. § 300.303(b)(2).

19.    In such evaluations, a school district must use a variety of assessment strategies to

gather relevant information about the child, and must assess the child "in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

20.    The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

21.    Despite the pandemic, the United States Department of Education did not waive requirements that public school districts provide FAPE to students with disabilities. *See Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak*, March 2020, available at, <https://sites.ed.gov/idea/idea-files/q-and-a-providing-services-to-children-with-disabilities-during-the-coronavirus-disease-2019-outbreak/#Q-A-1>.

22.    Public school districts' ongoing FAPE requirement also includes evaluating and obtaining the necessary data for progress monitoring and appropriate Individualized Educational Program ("IEP") development. *See id.*

**B.    After the school district identifies a student's needs in an evaluation report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

23.    At the beginning of each school year, a school district is required to develop an IEP that provides a FAPE for each child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A).

24.    Because a school district's obligation to offer FAPE derives from the child's residency in the community, even disabled students in private schools must be offered an IEP, and enrollment is not required to trigger the mandatory obligation to provide an offer of FAPE. *Shane T. v. Carbondale Area School District*, 2017 WL 4314555 at *9 (E.D. Pa. February 24, 2020); *see*

*also I.H. v. Cumberland Valley School Dist.*, 842 F. Supp.2d 762, 772-73 (E.D. Pa. 2012) ("requiring enrollment as a prerequisite to obtaining an IEP . . . would be at odds with the 'remedial nature' of the IDEA").

25.    A resident child eligible for special education services is entitled to an offer of FAPE upon parent's request. *L.T. v. North Penn School District*, 2018 WL 6600206 at \*7 (E.D.Pa. December 14, 2018). If that resident child is attending a privately-funded program, the child still has the right to an offer of a FAPE via a thorough evaluation and a proposed IEP. *Shane T.*, *supra*, 2017 WL 4314555 at \*9.

26.    The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999 (2017).

27.    The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "some progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01. Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

28.    In addition, an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered

an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 999-1000.

29.    The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably designed to allow a student to make *meaningful* educational progress and achieve "significant learning." *Pennsbury Heights Area School Dist. v. B.M.*, 248 F. Supp. 3d 618, 632 (E.D. Pa. 2017).

30.    Furthermore, it is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School District*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

**C.    A school district is required to reimburse a parent for private school tuition where the district failed to offer an appropriate IEP and where the private school placement was appropriate.**

31.    The Supreme Court established that when a school district's IEP is inappropriate, and when the parents obtain and pay for an appropriate private school program along with other equitable considerations, the school district must fund the private program provided by the child's parents. *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71, 105 S.Ct. 1996 (1985); *see also Florence County School Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct. 361 (1993); 34 C.F.R. § 300.148(c).

32.    As such, under IDEA, parents who disagree with their child's program and placement at a school district may unilaterally enroll their child in an appropriate out-of-district placement and obtain tuition reimbursement where a court determines that the school district has

not offered an appropriate education for the child. *Shore Reg'l High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198-99 (3d Cir. 2004).

33.    Under the test for tuition reimbursement from *Burlington*, *supra*, a court's first step is to determine whether the school district offered the student FAPE through an appropriate IEP. *Burlington*, 471 U.S. at 369-70.

34.    After examining the written IEP, the court must determine whether the private school was appropriate. *Burlington*, 471 U.S. at 369-70.

35.    The private school does not need to be the least restrictive environment, nor is it held to the same FAPE standards as the school district. *Florence County*, *supra*, 510 U.S. at 13-14.

36.    Tuition reimbursement for a family's unilateral decision to place a child in a private placement is appropriate if "the [school district] has not made free appropriate education available to the child in a timely manner prior to that enrollment." *Norristown Area School District v. F.C.*, 636 Fed. Appx. 857 (3d Cir. 2016) (not precedential).

37.    Once a court determines a placement is appropriate, the court may still reduce the tuition reimbursement if the court finds that an equitable reduction is necessary after examining (1) whether the parents informed the school district of their intent to remove the student, (2) whether the parents made their child unavailable for a reevaluation, or (3) whether the parents otherwise acted unreasonably. 34 C.F.R. § 300.148(d).

**D**.    **A student may also bring a tuition reimbursement claim under Section 504 and the ADA.**

38.    Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."

34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

39.    Similar to IDEA, Section 504 and its regulations require the identification of all children with disabilities and the provision of appropriate educational services. 29 U.S.C. § 794; *see also* 34 C.F.R. § 104.1 *et seq.*

40.    Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; *see also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

41.    "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

42.    Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008).

43.    A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition

reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA).

44.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*, 172 F.3d at 253.

45.     Tuition reimbursement is an available remedy under Section 504, as well as under IDEA. *Molly L. v. Lower Merion School Dist.*, 194 F.Supp.2d 422, 429 n.7 (E.D.Pa. 2002) ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA.").

46.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. *Id.*; *see also Tereance D. v. School Dist. of Philadelphia*, 548 F. Supp. 2d 162, 169-70 (E.D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504).

47.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415;

42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

**E.    This Court may hear additional evidence at the request of a party.**

48.    The IDEA provides for a federal district court to accept additional evidence when the Court or one or both parties establishes a need for it, in order for the Court to make a proper determination of the matter before it:

> In any action brought under this paragraph, the court-
>
> > (i) shall receive the records of the administrative proceedings;
> >
> > (ii) *shall hear additional evidence at the request of a party*; and
> >
> > (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C) (emphasis supplied).

49.    The Third Circuit construed this provision in *Susan N. v. Wilson School Dist.*, 70 F.3d 751 (3d Cir. 1995), holding that "the question of what additional evidence to admit in an IDEA judicial review proceeding, as well as the question of weight due to the administrative findings of fact, should be left to the discretion of the trial court." 70 F.3d at 760; *see also Carlisle Area School Dist. v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995); *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1990).

50.    "The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing.'" *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 791-92 (1st Cir. 1984) (emphasis added), *aff'd on other grounds*, 471 U.S. 359 (1985).

## V.    <u>Procedural History</u>

51.    Q.G. was enrolled in and attended school in the District from kindergarten (the 2019-2020 school year) through first grade (the 2020-2021 school year).

52.    Q.G. attended the Pilot School for second grade (2021-22 school year), paid for by the District via a settlement based on disagreement over Q.G.'s programming for kindergarten and first grade.

53.    The Parents participated in an IEP meeting with the District on or about July 25, 2022 to develop a program and placement for third grade (2022-23).

54.    After the meeting, the Parents provided the District with written notice of their disagreement with the IEP and intent to maintain Q.G.'s placement at the Pilot School and seek tuition reimbursement.

55.    On March 3, 2023, the Family filed a Special Education Due Process complaint against the District for tuition reimbursement, an equitable remedy available under IDEA and Section 504, for Q.G.'s third grade year (the 2022-23 school year).

56.    On March 8, 2023, the Secretary of Education for the State of Delaware appointed the following Hearing Panel Members to conduct a hearing and issue a final written decision in the matter: (1) Jonathan Harting, Esquire (Chair); (2) Diane Latocha; and (3) Jon Fletcher.

57.    An evidentiary hearing was held on April 20 and 21, 2023.

58.    The Family filed a Motion to Recuse Ms. Latocha and a Motion for a New Hearing on April 24, 2023. The District filed a Response to the motion on April 27, 2023.

59.    On May 3, 2023, the Panel issued an order, granting the motion's request for recusal of Ms. Latocha but denied the request for a new hearing.

60.     Thereafter, even after she was recused but before the Panel issued its final decision on the merits, Ms. Latocha contacted the Panel to try to defend her criticism of the Family's examination of a witness and her *ex parte* communication with counsel.

61.     The Panel issued a written decision on the merits on May 19, 2023, denying the Family relief.

## VI.    <u>Factual History</u>

62.     Plaintiffs incorporate by reference the preceding paragraphs.

63.     Q.G. is a nine-year-old student who resides with his parents in the School District and currently attends Pilot School, a private school located in Wilmington, Delaware.

64.     Q.G. is currently eligible for special education services under the IDEA eligibility category of Specific Learning Disability ("SLD") in Basic Reading and Written Expression.

65.     Since kindergarten Q.G. struggled with letter identification and phonemic awareness, as well as low frustration tolerance in response to difficult academic demands, which would result in tantrum-like behaviors and making statements regarding wanting to die.

66.     Q.G. was diagnosed with dyslexia by Dr. Douglas Tynan in July of 2021.

67.     In winter of 2022, the District requested to observe Q.G. at Pilot, and the Parents consented.

68.     Two observations occurred in February of 2022, one by Sara Gleason, and one by Cara Beach and Nicole Warner.

69.     In anticipation of the 2022-23 school year, and with the consent of the Parents, the School District reevaluated Q.G. in June and July 2022, and issued a new Evaluation Report on or about July 25, 2022 ("2022 ER").

70.     An additional observation of Q.G. by Ms. Gleason in May 2022 was also

undertaken as part of the reevaluation.

71.    Results of the 2022 ER showed that cognitively, Q.G. performs in the average to high average range with a Full-Scale Intelligence Quotient ("FSIQ") of 107.

72.    On the Kaufman Test of Educational Achievement ("KTEA"), Q.G. performed in the Below Average to Low range in all areas of reading, the Low to Very Low range in all areas of written expression, and in the Below Average range in math calculations.

73.    However, the school psychologist who completed testing noted that during the administration of the KTEA, Q.G. presented with restlessness and impulsivity, as well as low frustration tolerance. Specifically, Q.G. "shut down and refused to complete work when it appeared difficult to him." Given all those factors, the District's school psychologist concluded that the results of this evaluation are likely an underestimate of certain abilities, specifically reading and written expression . . . ."

74.    The reevaluation also included the administration of the Parent Rating Scales of the Behavior Assessment Scales for Children, 3rd Edition ("BASC-3").

75.    Results of the BASC-3 revealed that Q.G. can have a low frustration tolerance and become easily overwhelmed when he does not perform up to standards. Concerns over disorganization, inattentiveness, and distractibility were also noted. Although no clinically significant scores were obtained on the BASC, both Parents indicated multiple areas of at-risk level behaviors.

76.    The District issued its evaluation report on or about July 25, 2022, concluding that Q.G. remained eligible for special education services under the IDEA as a child with an SLD in the areas of Basic Reading Skills and Written Expression.

77.    The Parents participated in an IEP meeting with the District on or about July 25,

2022 to develop a program and placement for the 2022-2023 school year.

78.    The resulting IEP contained goals in decoding, reading fluency, comprehension strategies, and sentence structure and conventions.

79.    There were no goals related to his needs in the area of executive functioning or social-emotional skills.

80.    While the IEP did include some accommodations and modifications, there was no SDI related to how direct instruction in Q.G.'s areas of need would occur.

81.    The IEP provided that all instruction in the goal areas would occur in the regular education environment for very short periods of time.

82.    It proposed that Q.G. receive targeted instruction in: (1) decoding 15 minutes per day in the regular education class for four days per week; (2) reading fluency 10 minutes per day in the regular education class for four days per week; (3) comprehension strategies for 15 minutes per day in the regular education class for four days per week; and (4) sentence structure and conventions for 15 minutes per day in the regular education class for four days per week.

83.    No related services such as counseling or participation in a Social Emotional Learning Class ("SEL") were included in the IEP.

84.    Given that the targeted instruction was to occur in the regular education class, Q.G. would be in regular education for the entire school day.

85.    No discussion occurred at the IEP meeting regarding any specific program or methodology to be used with Q.G.; although the Evidence-based Reading Interventions section of the IEP notes that for decoding and fluency the instruction program was Road to Reading.

86.    However, the publisher's instructions state that the program should be implemented for 50 to 60 minutes, five days per week, and not the 25 minutes (15 for decoding and 10 minutes

for reading fluency) contained in the July 25, 2022 IEP.

87.     The District's Director of Educational Services, Dr. Nicole Warner, explained that the Road to Reading Program is not specially designed instruction, but rather a regular education invention used as part of the District Multi-Tiered System of Supports ("MTSS").

88.     There were also no discussions regarding participation in a co-taught class, nor was participation in any such class included in the July 25, 2022 IEP.

89.     In response to the Parents' rejection of the IEP and notice of their intent to continue the placement at Pilot, the District requested and the Parents participated in another IEP meeting on August 22, 2022.

90.     While the Parents participated in that August meeting and raised their concerns over the District's proposal, and while there was some further discussion on what Q.G.'s day/program would look like, there was still no discussion of any specific reading program (other than Road to Reading), no discussion of any counseling services or SEL class, and no discussion of participation or placement in a co-taught class.

91.     In fact, the Parents' understanding from the August 22, 2022, meeting was that the District's method of reading instruction would be to not use any one program, but pull from a variety of programs.

92.     The District did not make any changes or revisions to the July 25, 2022 IEP as a result of the August 2022 meeting, and the Parents signed and returned the District's Prior Written Notice ("PWN") indicating their disapproval of the IEP and intent to move forward with Pilot.

93.     Pilot School is a private school designed for students who think and learn differently, located in Wilmington, Delaware.

94.     Pilot is registered with the State of Delaware as a nonpublic school and is accredited

through the Pennsylvania Association of Independent Schools, who accredits schools in Delaware and Pennsylvania.

95.     Students at Pilot have diagnosed learning differences, such as language-based learning differences, dyslexia, dysgraphia, Attention Deficit Hyperactivity Disorder ("ADHD"), and sensory needs.

96.     Students also generally have average cognitive scores but low achievement scores. Pilot provides an individualized environment for each student to meet his or her needs and help unlock their potential.

97.     Pilot also has embedded therapy during the day, as well as reading support teachers who push-in to the classroom and pull-out groups for extra support.

98.     At the time of his initial enrollment at Pilot, Q.G. displayed strong verbal skills and vocabulary but exhibited a significant deficit in his reading skills and showed a very low frustration tolerance for non-preferred tasks and tasks that were difficult for him.

99.     At Pilot, Q.G.'s program consists of 45 minutes per day of direct math instruction, plus an additional 15-minute math fluency class. He has a daily 45-minute language arts class where he receives instruction in oral reading fluency, reading comprehension, and written expression. Q.G. receives an additional 45-minute reading class using the Wilson Reading System ("Wilson") taught by a Wilson Level I Certified teacher. Q.G. also participates in a variety of specials classes including, art, physical education, aquatics, Ready Body Learning Minds (which is an occupational therapy/physical therapy hybrid class), and a Social Emotional Learning Class ("SEL"). Also embedded throughout his day at Pilot is the development of Q.G.'s executive functioning skills using visual reminders and verbal supports to help him learn to manage his time, remember his belongings, follow classroom routines and expectations, and initiate a task.

100.    Although Q.G.'s rate of progress is impacted by his profound reading disability/dyslexia, as well as his history of low frustration tolerance and anxiety, he has nevertheless made meaningful gains in both his social-emotional functioning and academic performance since attending Pilot.

101.    Academically, as of April 21, 2023, Q.G. was on step 3.1 in Wilson showing good progress.

102.    He is doing very well with his diction and using his working memory skills, and has improved in reading comprehension.

103.    When he first started at Pilot he had difficulty answering questions in a complete sentence and required a significant amount of support, but now is able write several sentences on a given topic. Socially-emotionally, while he once had frequent episodes when he first began Pilot, he now has far fewer frustration meltdowns.

104.    Q.G.'s recovery time to get himself back to the classroom is also much shorter than it was when he first began attending, and he does not require as much support.

105.    In the April 21, 2023 hearing session, during the Family's counsel's cross examination of Melissa Fabrizio, a witness offered by the District, Hearing Panel Member Latocha interrupted the examination to offer statements and criticisms of certain documentation from the Pilot School, namely a document entitled "Speech and Language Progress Update."

106.    At the conclusion of the witness' testimony, and over a break prior to the Family calling its first witness, Hearing Panel Member Latocha engaged in improper *ex parte* communication via email with counsel for the School District wherein she again discussed the criticism she was trying to make about the Speech and Language Progress Update when she interrupted the cross examination of Ms. Fabrizio.

107.    The email also copied the Hearing Chair, Johnathan C. Harting, Esq.

108.    In her email to the District's counsel, Ms. Latocha criticized the Speech and Language Progress Update for allegedly failing to meet standards of the American Speech and Language Association and claimed: "We could not accept the evaluation completed by the [Speech and Language Pathologist] at Pilot."

109.    Ms. Latocha did not copy counsel for the Family on the email to the School District's counsel.

110.    However, the School District's counsel forwarded a copy of the email to counsel for the Family that afternoon following the conclusion of the due process hearing.

111.    The Panel Chair decided to recuse Ms. Latocha.

112.    However, although recused, Ms. Latocha continued to attempt to influence the Panel's consideration of the issues before it.

113.    After being recused, but before the Panel issued its decision, Ms. Latocha sent a subsequent email to the Panel Chair defending her inappropriate criticism of the Family's examination of a witness and her unethical *ex parte* communication.

114.    Ms. Latocha's conduct is consistent with the Delaware Department of Education's practice of having *ex parte* communications with a due process hearing panel while the hearing panel is deliberating and drafting its decisions.

115.    Hearing panels are required to operate independent of the Delaware Department of Education.

116.    The Delaware Department of Education ("DDOE") is not permitted to involve itself in a hearing panel's deliberation or advise how a panel should craft a written decision.

117.    If permitted to supplement the record, the Family will present evidence not only of

Ms. Latocha's attempt to influence the Panel after her recusal, but also evidence of *ex parte* communication between a different hearing panel and the DDOE and its Delaware Department of Justice Deputy Attorney General ("DAG") in which DDOE and its DAG advised a panel on how to rule on preliminary matters and edited the written orders before they were published.

## VII.     The Hearing Panel's Errors

118.    The Plaintiff incorporates by reference the preceding paragraphs.

119.    The Panel erred by concluding that the District offered Q.G. FAPE through its July 25, 2022 IEP.

120.    The IEP in question contained insufficient and inappropriate goals which fail to appropriately address all Q.G.'s needs or provide a sufficient and objective means of monitoring progress.

121.    In fact, the proposed IEP contains just four basic and generic goals related to decoding, fluency, comprehension, and written expression.

122.    The IEP fails to provide any goals related to Q.G.'s weaknesses in executive function, his struggles with anxiety and low frustration tolerance, or his struggles with focus and attention.

123.    The IEP also includes inadequate and inappropriate specially designed instruction, including, but not limited to, the provision of inappropriate academic supports, and inappropriate placements.

124.    Q.G. has a profound reading disability; specifically dyslexia.

125.    As such, Q.G. requires a specific reading program designed to help remediate the impact of the reading disorder.

126.    Moreover, any such reading program for a child with Dyslexia needs to be

implemented with fidelity (i.e., consistent with the design and implementation protocols for the program upon which the research is based).

127.    However, the July 25, 2022 IEP fails to offer Q.G. such a program.

128.    In fact, the only program referenced in the IEP is the Road to Reading Program, which is not specifically designed for students with dyslexia and is not itself research-based.

129.    The Panel erred by holding that the Road to Reading Program would be an appropriate reading program to address Q.G.'s needs.

130.    The District's own Director of Educational Services, Dr. Nicole Warner, testified that Road to Reading program is not a special education program or considered specially designed instruction, but rather is regular education intervention used as part of the District's MTSS supports.

131.    The July 25, 2022 IEP was not supported by a comprehensive evaluation of all suspected areas of need.

132.    The District unquestionably failed in its statutory duties to Q.G. and the Hearing Panel erred in ruling otherwise and in failing to award tuition reimbursement as relief.

133.    As the Panel found, the IEP only addressed Q.G.'s weaknesses in "four areas[:] . . . phonics and decoding, reading fluency and accuracy, reading comprehension, and written expression."

134.    The Panel erred by requiring "medical testimony concerning the degree of [Q.G.'s] dyslexia."

135.    Medical testimony is of little, if any, relevance when determining whether a student is receiving a FAPE and whether his needs are being met in reading (or in any other educational domain).

136.    The Family appropriately elicited testimony from Mary Elizabeth Morris, the Pilot School's Head of the Lower Division.

137.    Ms. Morris testified that part of her duties included monitoring student progress.

138.    As the Panel found, "Ms. Morris opined that Student was making significant progress at the Pilot School, given her opinion of Student's dyslexia as it related to the academic work at the school."

139.    As an educator and as an individual whose job it is to monitor student progress, she is an appropriate witness to opine as to a student's educational progress.

140.    A medical doctor—who is neither teaching Q.G. specifically nor an educator generally—is not an appropriate witness to testify as to Q.G.'s progress in reading.

141.    Dyslexia is recognized in the IDEA as a disability that falls under the eligibility category definition of a Specific Learning Disability. 34 C.F.R. §300.8(c)(10).

142.    Medical testimony is not relevant to whether a student is making progress in reading.

143.    The Panel erred by requiring testimony from a medical doctor and by using the absence of said testimony to limit the weight of Ms. Morris' testimony.

144.    The Panel erred by holding that the IEP addressed all Q.G.'s areas of need, including social, emotional, and executive functioning needs.

145.    The Panel's findings concerning the IEP's emotional and executive functioning supports is vague and unclear:

> The Panel also finds the IEP was adequately drafted with Student's socio-emotional wellbeing in mind. Although not a formal element of Student's IEP, the District included a "Self-Monitoring and Regulation" element for Student based upon the reports of Parents and observations of teachers leading up to the July 2022 IEP meeting.

146.    If Q.G.'s socio-emotional supports are "not a formal element of [his] IEP," then the supports the Panel is referring to are not part of the District's offer of a FAPE.

147.    The Panel erred by including in the District's IEP (and offer of a FAPE) alleged supports and services that are not a formal part of his IEP.

148.    The Panel also states that "there is an extensive list of accommodations, modifications and supports to assist Student's well-being." However, the Panel did not identify any.

149.    The Panel found that "[t]he District was aware of Student's low frustration tolerance and executive functioning concerns[,]" but the Panel did not explain what supports, if any, the School District implemented to address those concerns.

150.    The Panel erred by failing to apply the Supreme Court's and Third Circuit's demanding standard for providing a FAPE

151.    The District's July 2022 IEP fails to provide any goals related to the development of executive functioning skills or coping strategies related to Q.G.'s low frustration and focus issues.

152.    The Panel erred by concluding that Q.G.'s July 2022 IEP was supported by a comprehensive evaluation in all areas of need.

153.    The District failed to collect additional socio-emotional information from Q.G.'s teachers at the Pilot School.

154.    The District's school psychologist emailed BASC rating forms directly to the Pilot teachers at the end of the school year/beginning of the summer when those teachers were not there, and then never followed up with anyone when the rating forms were not returned.

155.    Pilot cannot even be sure if the teachers ever got the rating scales from the District.

156.    Had the District's psychologist followed up with the Head of the Lower School, Ms. Mary Elizabeth Morris, she would have ensured the rating scales were completed and returned.

157.    The School District proposed to place Q.G. in a large group general education environment with 22 to 27 students.

158.    The Panel erred by concluding that Q.G. could receive a FAPE in the general education, large group environment.

159.    The evidence in this case supports that Q.G. requires a smaller environment to learn, and simply putting Q.G. in a smaller group in that larger classroom for a short period of time does not in any way meet his needs.

160.    In addition, it was legal error for the Panel to consider testimony concerning Q.G.'s placement that differed from the placement described in the four corners of the written IEP.

161.    When determining whether tuition reimbursement is warranted, a hearing panel or federal court is only permitted to examine the written IEP, which, here, did not reference a co-taught classroom, which is where the District allegedly would have placed Q.G., according to testimony from the due process hearing.

162.    A parent cannot make an informed choice as to the appropriateness of a placement if they do not know how much time their child will be in the special education classroom.

163.    Having established that the District failed to offer Q.G. a FAPE during the 2022-2023 school year, the Family unmistakably fulfilled the first prong of the *Burlington*/*Carter* tuition reimbursement analysis, and the Hearing Panel erred in concluding to the contrary.

164.    Because the Hearing Panel mistakenly found that the District offered Q.G. a FAPE for the school year at issue, the Panel did not consider the two additional prongs of the tuition reimbursement analysis: the appropriateness of the private school, and whether the equities call

for any reduction in the tuition award; however, it is clear that the Parents met their burden of proof regarding these prongs as well.

165.    As described above, the evidence demonstrated that the Pilot School is an appropriate placement for Q.G..

166.    There is no equitable reason to reduce a tuition reimbursement award.

167.    The Family contacted the District in April 2022 to explore returning Student to the District for the 2022-2023 school year.

168.    The Family completed all necessary paperwork and signed the necessary releases for the District to evaluate the Student and obtain records from outside providers.

169.    The Family made Q.G. available for testing.

170.    The Family participated in the IEP meetings in July and August of 2022

171.    Because the Family met the third prong of the tuition reimbursement analysis, there is no equitable basis to reduce or deny tuition reimbursement.

172.    The District's failure to offer Q.G. a non-discriminatory, appropriate educational environment resulted in him being excluded from participation in, denied the benefits of, or subject to discrimination in, him education in violation of not only IDEA, but Section 504 and the ADA as well.

173.    The Hearing Panel therefore erred in not awarding tuition reimbursement under not only IDEA, Section 504 as well.

174.    Finally, the Panel erred by failing to award the Family a new hearing based on the *ex parte* communication from Ms. Latocha to counsel for the School District.

175.    Ms. Latocha demonstrated a clear bias against the Family by interrupting Family's counsel's examination of a witness and by criticizing the Pilot School's Speech Language Progress

Update in the midst of the hearing.

176.    Ms. Latocha then emailed counsel for the School District *ex parte* to explain her criticism.

177.    Ms. Latocha copied the Panel Chair, Jonathan Harting, on her *ex parte* communication.

178.    Neither Ms. Latocha nor Mr. Harting shared the ex parte communication with counsel for the Family.

179.    Mr. Harting then authored the order of May 3, 2023, refusing the request for a new hearing.

180.    Ms. Latocha then tried to influence the Panel even after her recusal.

181.    The Family would not have known of the *ex parte* communication without the disclosure of the communication by counsel for the School District.

182.    The matter should not be remanded as there is a real and substantial risk that a new hearing panel will not be fair, impartial, and independent.

183.    Instead, the Family is requesting the Court decide the substantive issue in this case, namely, the Family's request for tuition reimbursement.

184.    Ordinarily, appeals of special education due process matters require a Federal District Court to undertake a fully independent review of the record and the hearing officer's decision and employ a modified de novo review of the hearing panel's conclusions, giving "due weight" to the hearing panel's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *Mary T. v. School District of Philadelphia*, 575 F.3d 235, 241 (3d Cir. 2009); *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003).

185.    However, Ms. Latocha's conduct tainted the deliberation process and the Panel's

decision should be ignored in its entirety.

186.    This Court should give no weight to the Panel's conclusions.

187.    The Family is respectfully requesting the opportunity to present additional evidence that Family's counsel's firm has uncovered concerning collusion between Hearing Panels and the Department of Education in Delaware while a hearing panel is deliberating on an issue.

188.    The Family believes and therefore avers that Hearing Panels in Delaware are not adequately trained, selected on bases apart from proper credentials and experience, and do not operate independent of the Delaware Department of Education, but instead receive substantive support from the Department of Education in adjudicating issues in due process hearings, all of which violates IDEA, Section 504, and Delaware law.

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.    Assume jurisdiction over this action;

2.    Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.    Reverse the Hearing Panel's Decision and award the Family tuition reimbursement and related costs for 2022-2023 school year at the Pilot School;

4.    Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

5.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA; and Delaware law; and

6.    Grant such other relief as this Court deems proper.

Respectfully submitted,

Caitlin E. McAndrews, Esquire
Delaware ID No. 6179
McANDREWS, MEHALICK, CONNOLLY,
HULSE and RYAN, P.C.
Foulk & Wilson Professional Centre
900 Foulk Road, Suite 201
Tele: 302-380-4975
Attorney for Plaintiff